IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                        No. 17-20025-SHM-dkv

REGINALD MONROE,

    Defendant.

---

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS

---

On January 26, 2017, the grand jury returned a four-count indictment charging the defendant, Reginald Monroe ("Monroe"), with possession with intent to distribute marijuana, possession with intent to distribute cocaine, possession of a firearm in relation to a drug trafficking crime, and possession of a firearm as a convicted felon in violation of 18 U.S.C. § 922(g). (Indictment, ECF No. 1.) Now before the court is Monroe's June 28, 2017 motion to suppress evidence obtained by Memphis Police Department ("MPD") officers following a traffic stop of Monroe on August 17, 2016, during which the police searched and subsequently impounded Monroe's vehicle. (Def.'s Mot. Suppress, ECF No. 26.) The government filed a response on July 12, 2017. (ECF No. 32.) The motion was referred to the United States Magistrate Judge for a report and recommendation. (ECF No. 27.)

Pursuant to the reference, the court held an evidentiary hearing on August 25, 2017. At the hearing, the government called three witnesses: Detective Josh Myers ("Detective Myers"), Detective DeWayne Smith ("Detective Smith"), and Detective Darnell Gooch ("Detective Gooch"), all of whom are detectives for the Organized Crime Unit ("OCU") of the MPD and who were on the scene the day of Monroe's arrest. The government introduced two exhibits into evidence. Monroe then called seven witnesses: (1) Byron Cook ("Cook"), who picked up the vehicle leased by Monroe at the impound lot; (2) Officer Louis Brownlee, the legal liaison for MPD; (3) Detective Markus Stephens ("Detective Stephens") from the OCU, who compiled the Incident Report; (4) Officer Darnell Banks, who prepared the tow ticket for Monroe's vehicle; (5) Detective Myers; (6) Michael Pryor, an investigator from the federal public defenders' office; and (7) Monroe himself. Monroe introduced fourteen exhibits into evidence.[1]

At the evidentiary hearing, Monroe requested additional time to file a supplemental brief addressing whether Monroe consented to the search of his vehicle. Detective Myers raised the issue of consent for the first time during the hearing, and neither side had filed briefs regarding consent. The court granted the request, and, on September 25, 2017, Monroe filed a

---

[1] One of the fourteen exhibits is an ID only exhibit.

supplemental brief in support of his motion to suppress. (ECF No. 52.) The government responded on October 14, 2017. (ECF No. 55.)

After careful consideration of the statements of counsel, the testimony of the witnesses, the exhibits introduced at the hearing, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that the motion to suppress be granted.

## I.    PROPOSED FINDINGS OF FACT

On August 17, 2016, Detectives Myers and Smith performed a traffic stop of Monroe's vehicle based on a purported window tint violation. During the ensuing traffic stop, Monroe fled, leading to his arrest. The Incident Report, prepared by Officer Stephens, states in relevant part:

> On 08/17/2016 at 1440 hours, Detectives Myers and Smith were in the area of Watkins and McNeil at which time Detective Myers observed a red colored Honda Accord traveling northbound Watkins near Lexington circle with its windows darker than the legal limits. The vehicle was then stopped at 1230 N. Watkins at time the driver, the later identified Reginald Monroe, jumped out and ran from the vehicle south bound towards N Lexington circle. Detectives Myers and Smith then chased Monroe ordering him to stop running, Monroe continued running. . . . Detective Smith returned back to the vehicle and during his inventory, recovered in the trunk a pink shoe box containing several plastic baggies of a green leafy substance resembling marijuana, also a pill bottle with several white crystal rocks resembling crack cocaine.

(Incident Report, Ex. 15.)  The Affidavit of Complaint, for which Detective Myers signed as the affiant, states the same with the additional fact that, "Window tint measures at 45%." (Aff. Compl., Ex. 3.)

Detective Myers, the government's first witness, has worked for the OCU for eight years, before which he worked in uniform patrol for the MPD, for a total of fourteen years.  (Tr. 13:20-24.)  Detective Myers testified that on August 17, 2016, he and Detective Smith were on duty patrolling the area near Jackson Avenue and Watkins Street in Memphis, Tennessee, to perform a "crime time out," during which officers are assigned to particular areas of the city with high crime rates, based on crime analysis data compiled by the MPD.  (*Id.* at 13:25-15:6.) The weather was cloudy, overcast, and raining periodically. (*Id.* at 15:15-16.)

According to Detective Myers, he and his partner Detective Smith, who was riding in the car with him, first saw Monroe on Jackson Avenue driving a red Honda Accord that appeared to have an illegal level of window tint.  (*Id.* at 14:7-11, 16:10-13, 30:1.)  By the time they were able to turn around to stop the red Honda Accord and check the window tint, the Honda had pulled into a barber shop parking lot, so the officers did not conduct a traffic stop at that time.  (*Id.* at 30:1-13.)  Detective Myers stated that he and Detective Smith saw the red Honda Accord a

4

second time later that day and decided to conduct a traffic stop. (*Id.* at 32:3-9.)    When the officers activated their emergency lights, Monroe pulled over immediately. (*Id.* at 33:7-12.)    On cross examination, Detective Myers had trouble recalling the circumstances surrounding the second time he saw the red Honda Accord, particularly which direction the cars were traveling and the street where the traffic stop occurred. (*Id.* at 26:16-27:23, 30:1-32:6.)    Later on cross examination, Detective Myers identified the traffic stop as having occurred somewhere near a partition bridge in the Lexington Circle area indicated in Exhibit 2. (*Id.* at 28:12-20.)

According to Detective Myers, Monroe was not speeding, his tags were current, and there were no other traffic infractions aside from the window tint appearing darker than the legal limit. (*Id.* at 32:10-24.)    Detective Myers testified that he did not know anything about Monroe before the traffic stop. (*Id.* at 36:8-18.)

Detective Myers stated that when Monroe pulled over, he and Detective Smith both exited their vehicle and approached Monroe. (*See id.* at 16:16-20.)    Detective Myers testified that he smelled raw marijuana as he got close to the car.[2]    (*Id.* at

---

[2]Detective Myers stated that raw marijuana is so potent, "you can literally smell it when you are driving by." (Tr. 18:25-19:1.)  However, he also testified that he could not smell

16:20-21.) However, neither the Affidavit of Complaint nor the Incident Report contains any indication that either officer smelled marijuana or that they communicated their observation to each other or to Monroe. (*See* Aff. Compl., Ex. 3; Incident Report, Ex. 15.) Detective Myers stated that he went to the driver's side of Monroe's vehicle and Detective Smith approached the passenger's side. (Tr. 16:16-21.) Detective Myers informed Monroe that they stopped him because of his window tint. (*Id.* at 37:6-8.) Detective Myers stated that he did not have his tint meter, which measures window tint levels, on his person at this time. (*Id.* at 35:13-15.) According to Detective Myers, he asked Monroe for his driver's license, which Monroe promptly provided. (*Id.* at 35:16-24.) Detective Myers testified that he asked Monroe about the marijuana smell and whether he could "peek" into the car. (*Id.* at 16:23-17:2.) According to Detective Myers, Monroe consented to a search of his vehicle. (*Id.*) Neither the Affidavit of Complaint nor the Incident Report contains any indication that Monroe consented to a search. (*See* Aff. Compl., Ex. 3; Incident Report, Ex. 15.) The Affidavit of Complaint and the Incident Report also do not

---

the raw marijuana when he was behind Monroe's vehicle on August 17, 2016. (*Id.* at 19:3-5.)

contain any description of events leading up to Monroe's flight from the traffic stop. (*See id.*)[3]

Detective Myers testified that Detective Stephens prepared the Arrest Ticket based on what Detective Myers recounted to him.[4]  (Tr. 22:5-8.)  Although Detective Myers initially testified that he never reviewed the documents Officer Stephens prepared, after being shown the Affidavit of Complaint, (Ex. 3), on cross examination, he conceded that he had reviewed the Affidavit of Complaint and sworn to its truthfulness in front of Judicial Commissioner Rhonda W. Harris.  (Tr. 46:3-48:20.) Further, on cross examination, Detective Myers admitted that facts indicating consent and smelling marijuana would typically be included in documents such as the Affidavit of Complaint and Incident Report.  (*Id.* at 49:7-50:10.)  Detective Myers also testified that officers can supplement such documents if important information is left out.  (*Id.* at 52:13-19.) Detective Myers filed a supplement on April 5, 2017, to include

---

[3]According to the Affidavit of Complaint and the Incident Report, "The vehicle was then stopped at 1230 N. Watkins at time the driver, the later identified Reginald Monroe, jumped out and ran from the vehicle south bound towards N Lexington circle." (*See* Aff. Compl., Ex. 3; Incident Report, Ex. 15.)

[4]On cross examination, Detective Myers stated that the Incident Report, Affidavit of Complaint and the Arrest Ticket all contain similar, if not identical, versions of the events because information is automatically transferred from one document to the others.  (Tr. 52:6-9; Gov't Resp. Opp'n Suppl. Mem. 2 n.1, ECF No. 55.)

the results of a window tint test performed after the red Honda Accord had been towed.[5]    (Suppl., Ex. 4.)    However, neither Detective Myers nor Detective Smith filed a supplement to indicate that he smelled marijuana or that Monroe consented to a search of his vehicle.    (*See id.*; Aff. Compl., Ex. 3; Incident Report, Ex. 15.)

Detective Myers testified that he asked Monroe out of his vehicle, at which time Detective Myers patted him down.    (Tr. 17:3-9.)    Detective Myers did not find any contraband on Monroe during the pat down; he instructed Monroe to stand at the back of the Honda.    (*Id.* at 17:3-17.)    Detective Myers stated that Detective Smith stood at the rear of the Honda with Monroe as Detective Myers began "peek[ing] through" the front driver's compartment.    (*Id.* at 17:21-25.)    According to Detective Myers, there was no contraband in the interior driver and passenger compartments of Monroe's vehicle.    (*Id.* at 39:25-40:25.) Detective Myers testified that the smell of marijuana became stronger towards the rear of the car.    (*Id.* at 18:1-2.) Detective Myers stated that he lowered an armrest in the middle of the back seat which led to a latched compartment that opened

---

[5]The supplement erroneously indicates that the window tint test was performed on November 1, 2017.    Detective Myers testified that the November 1, 2017 date was a typo, as that date had not yet occurred at the time of the suppression hearing.

into the trunk. (*Id.* at 18:4-10.) Detective Myers testified that the latch was not locked. (*Id.* at 41:1-18.) When he opened the latch, Detective Myers saw a pink shoebox with the lid closed, directly in front of the latched compartment in the trunk. (*Id.* at 18:4-8.) Detective Myers stated that he reached his arm through the back seat compartment and into the trunk to open the lid of the pink shoe box. (*Id.* at 18:7-11, 42:18-43:17.) Detective Myers saw contraband inside the box. (*Id.* at 18:9-10.) Detective Myers testified that when he stuck his hand into the trunk, Monroe fled. (*Id.* at 18:10-11, 42:18-43:17.)

Detective Myers stated that Detective Smith chased Monroe when he fled from the traffic stop, (*id.* at 19:10), while he stayed with the car and called for assistance, (*id.* at 43:22-44:1). According to Detective Myers, Monroe ran a couple houses down and jumped over a fence, where he fell about sixty feet from the fence into a wide creek surrounded by large rocks. (*See* Ex. 1; Tr. 19:8-22.)

According to Detective Myers, Detective Gooch arrived at the scene of the creek bed pursuant to the call for backup. (Tr. 44:8-10.) Detective Gooch entered the water where Monroe was attempting to swim away and took Monroe into custody. (*Id.* at 20:20-21:5.) Because Monroe appeared injured, the fire department checked him for injuries. (*Id.* at 21:9-23.)

9

Detective Myers testified that when he returned to Monroe's vehicle,[6] he recounted the incident to Officer Stephens, who prepared the Arrest Ticket. (*Id.* at 22:5-8.) According to Detective Myers, after Monroe was in custody and the officers had returned from the creek bed, he measured the window tint on the Honda but he did not record the results at that time. (*See id.* at 66:18-21.) Detective Myers explained that MPD officers check window tint for illegal light levels with a tint meter. (*See id.* at 44:23-45:24.) When the officer sets the tint meter on a window, it registers the light level immediately and shows a digital reading within seconds. (*Id.* at 44:18-45:2.) Detective Myers testified that the tint meter read 41% when he tested it on the scene on August 17, 2016, (*id.* at 24:21-25),[7] which is within the legal limit of 35%. *See* Tenn. Code Ann. § 55-9-107(1)(1)(A)(making it illegal to operate a motor vehicle with window tint that results in visible light transmittance of less than 35%).

The government's second witness, Detective Smith, has worked for the OCU for six years, and the MPD for a total of nineteen years. (Tr. 74:16-18.) Detective Smith's testimony

---

[6]It is unclear from his testimony when Detective Myers left the scene of the traffic stop and went to the scene of the arrest.

[7]The Affidavit of Complaint, dated August 17, 2016, indicates that the tint level was 45%. (Aff. Compl., Ex. 3.)

corroborated the testimony of Detective Myers for the most part but with several noteworthy differences. Detective Smith also stated that it was a gloomy and rainy day on August 17, 2016. (*Id.* at 85:20-24.) Detective Smith testified that upon stopping Monroe for the tint violation, neither he nor Detective Myers exited their vehicle with a tint meter because they were going to talk to Monroe, tell him why they stopped him, make sure everything was safe, and then measure the tint. (*Id.* at 86:8-25.) On direct examination by the government, Detective Smith testified that Detective Myers asked Monroe if he could take a look in his car and that Monroe agreed. (*Id.* at 76:25-77:5.) However, on cross examination, Detective Smith stated that he did not actually hear Detective Myers ask Monroe to consent to a search. (*Id.* at 91:15-92:6.)

Detective Smith testified that he did not follow Detective Gooch and Monroe into the ditch after Monroe jumped, so he returned to the scene of the traffic stop and began "inventorying" the trunk of Monroe's vehicle. (*Id.* at 79:8-13.) However, Detective Smith did not recall at which point the trunk was popped open or who opened the trunk. On cross examination, Detective Smith was unable to testify as to whether he opened the trunk to begin the inventory search or whether the trunk was already opened when he returned to Monroe's vehicle to begin the inventory search. (*Id.* at 93:3-94:5.)

11

Detective Smith testified that the pink shoebox found in the trunk contained 123.5 grams of marijuana sealed in plastic baggies, and eleven grams of cocaine and five grams of crack cocaine in a prescription pill bottle. (*Id.* at 79:20-24.) Detective Smith also found a pistol in the trunk loaded with twelve rounds, which was inside a zippered canvas bag. (*Id.* at 80:1-3; *see also* Exs. 8, 9.) Detective Smith testified that Monroe's vehicle was sent to the impound lot following Monroe's arrest. (Tr. 101:4-14.)

Monroe's testimony also presented a different version of events. Monroe testified that the traffic stop occurred when he was driving to pick his son up from school; he was not in a hurry, and he had not been speeding. (*Id.* at 177:21-178:4.) Monroe stated that Detectives Myers and Smith were driving a blue Durango SUV, (*id.* at 178:10-11), but the officers testified they were driving a black Ford Explorer (*id.* at 25:24, 63:12-13, 75:5-6). Moreover, Monroe stated that the officers did not say anything about smelling marijuana and they did not ask him to consent to a search. (*Id.* at 180:5-12.) Monroe testified that as Detective Myers was searching his vehicle, he popped open the trunk, which is when Monroe fled. (*Id.* at 181:13-20.)

The defense witness, Cook, offered testimony indicating that the latched compartment leading to the trunk of Monroe's vehicle could have been locked, thus further calling into

12

question Detective Myers's testimony that he viewed the interior of the trunk by opening the latched compartment in the back seat and that he did not pop open the trunk.   Cook, the operations manager at Swivel's Auto Center, who took custody of Monroe's leased vehicle from the impound lot, took pictures of the car after he fixed various parts of the car that were broken as a result of the search.   (*Id.* at 119:11-120:14; Collective Ex. 11.)   The fourth and fifth pictures in the collective exhibit illustrate the latched compartment leading to the trunk.   (*See* Collective Ex. 11.)   The pictures show a lock on the compartment latch, into which a key can be inserted to unlock and open the latch.   (*See id.*)   Cook stated that he specializes in repairing Hondas and that generally, in Hondas like this Accord, the latch to the trunk is locked.   (Tr. 129:20-130:3.)   Cook further testified that the latch only opens when the key turns the lock to unlatch the compartment.   (*Id.*)

## II.   PROPOSED CONCLUSIONS OF LAW

In the instant motion to suppress, Monroe challenges the validity of his traffic stop.   (Def.'s Mot. Suppress 4-5, ECF No. 26.)   Monroe further argues that even if the traffic stop was legitimate, the degree of intrusion exceeded the purpose of the traffic stop.   (*Id.* at 5-10.)   In his supplement, he also argues that he did not provide consent for Detective Myers to

search his car and that the inventory search was improper. (Def.'s Suppl. Mem., ECF No. 52.)

In response, the government submits that there was a proper basis for the traffic stop and that the length of the stop was reasonably related to the situation at hand. (Gov't's Resp. 3-6, ECF No. 31; Gov't's Suppl. Resp., ECF No. 55.) The government did not respond to Monroe's argument that he did not consent, other than classifying consent as a "highly relevant fact[] not included in the incident report narrative." (Gov't's Resp. Opp'n Suppl. Mem. 2, ECF No. 55.)

A.   Validity of the Traffic Stop

A traffic stop is a "seizure" subject to the reasonableness requirement of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996); *United States v. Guajardo*, 388 F. App'x 483, 487 (6th Cir. 2010)(quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002))("The Fourth Amendment's prohibition against unreasonable searches and seizures by the government 'extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'"). In the Sixth Circuit, the applicable standard to justify a police officer's stop of a vehicle based on a traffic violation depends on whether the violation is an ongoing or completed offense. *See United States v. Simpson*, 520 F.3d 531, 540-41 (6th Cir. 2008). The Sixth Circuit held in *Simpson* that based on its prior

14

decision in *United States v. Freeman*, 209 F.3d 464 (6th Cir. 2000), officers must have probable cause to initiate a traffic stop for a completed misdemeanor, such as veering into an emergency lane, but only reasonable suspicion for a traffic stop for an ongoing misdemeanor, such as driving on a suspended license. *Simpson*, 520 F.3d at 541; *see also United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007)(finding that the misdemeanor traffic offense of following another vehicle should be evaluated under reasonable suspicion). Because the alleged violation in the present case was "ongoing," i.e., the officers believed Monroe to be driving with window tint darker than the legal range, the court applies the reasonable suspicion standard.

"Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person of criminal activity." *United States v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016)(quoting *United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008)). The permissibility of a traffic stop does not depend on the actual motivations of the individual officers involved. *Whren*, 517 U.S. at 813; *United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2010); *United States v. Burton*, 682 F.3d 514, 516 (6th Cir. 2012). Thus, if at the time of the stop the officer had a reasonable suspicion that the target was violating a traffic law

15

or ordinance, "then it simply does not matter whether [the officer] intended to stop [the defendant] on the basis of that traffic violation" or instead intended to stop the defendant because he suspected criminal activity was afoot. *Hughes*, 606 F.3d at 316.

Here, regardless of the actual motivations of the officers, they had reasonable suspicion that Monroe's window tint was darker than the legal limit. Detectives Myers and Smith both testified that based on their experience and the cloudy weather conditions that day, they believed Monroe's window tint resulted in visible light transmittance of less than 35%, which constitutes a violation of state law. *See* Tenn. Code Ann. § 55-9-107(a)(1)(A). Moreover, based on the objective fact that Monroe's window tint was around 40%, which is close to the legal limit, and the fact that it was overcast outside, making the windows appear darker than usual, the court finds that there was reasonable suspicion for initiating the traffic stop. Accordingly, the initial traffic stop was not improper.

B.    <u>Scope of the Traffic Stop</u>

Monroe next argues that the degree of intrusion was not reasonably related in scope to the purpose of a traffic stop for an alleged window tint violation. According to the Sixth Circuit, "if we conclude that the basis for the stop was proper at its inception, we must then determine 'whether the degree of

16

intrusion . . . was reasonably related in scope to the situation at hand . . . .'" *United States v. Bonilla*, 357 F. App'x 693, 698 (6th Cir. 2009)(quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)).

"[B]ecause the touchstone of any Fourth Amendment analysis is reasonableness, we must conduct a fact-bound, context-dependent inquiry in each case. . . . [including] whether the 'totality of the circumstances surrounding the stop' indicates that the duration of the stop as a whole . . . was reasonable." *United States v. Everett*, 601 F.3d 484, 493-94 (6th Cir. 2010)(citations and emphasis omitted). "'In assessing whether a [stop] is too long in duration . . ., we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Id.* at 494 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "In other words, the overarching consideration is the officer's diligence — i.e., his 'persevering' or 'devoted . . . application to accomplish [the] undertaking' of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." *Id.* (citation and emphasis omitted).

The Sixth Circuit has held that an officer's request for a "driver's license, registration, rental papers, running a computer check thereon, and issuing a citation do not exceed the

scope of a traffic stop" for a traffic violation. *Bonilla*, 357 F. App'x at 696; *see also United States v. Hill*, 195 F.3d 258, 269-70 (6th Cir. 1999)(finding that questioning passengers of a U-Haul as to whether they were moving did not unduly prolong the stop). Further, "[o]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Bonilla*, 357 F. App'x at 696 (quoting *Pennsylvania v. Mimms*, 434 U.S. 107, 111 n.6 (1977)); *see also United States v. Hockenberry*, 730 F.3d 645, 658 (6th Cir. 2013)(quoting the same).

Once the purpose of the traffic stop has been fulfilled, "a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008)(citations and internal quotation marks omitted); *Hill*, 195 F.3d at 264 (citations omitted)("Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."). The odor of marijuana provides reasonable suspicion to further detain a

vehicle after the purpose of a traffic stop has ceased. *See United States v. Simpson*, 520 F.3d 531, 543 (6th Cir. 2008). The burden is on the government to prove by a preponderance of the evidence that the circumstances justified a warrantless search. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *United States v. Bradley*, 163 F. App'x 353, 357 (6th Cir. 2005)(unpublished).

Lastly, the court is given wide latitude in making its credibility determinations. *United States v. Haynes,* 301 F.3d 669, 679 (6th Cir. 2002)(citing *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 573-75 (1985)).   "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015).   However, the court does not have unlimited discretion, and a court may not credit a witness's testimony if documents or other objective evidence contradict the witness's story; or the story itself is "'so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.'" *Haynes*, 301 F.3d at 679-80 (quoting *Anderson*, 470 U.S. at 575).

Here, Detective Myers instructed Monroe to exit his vehicle and to provide his license.   Pursuant to *Bonilla*, Detective Myers did not err in ordering Monroe out of his vehicle and

asking for his license. *See Bonilla*, 357 F. App'x at 696
(quoting *Mimms*, 434 U.S. at 111 n.6). Although it is suspicious
that neither officer carried a tint meter with him when they
approached Monroe's vehicle for a tint violation, this fact
alone did not unduly extend the scope of the traffic stop.

The government maintains that the search of Monroe's
vehicle was proper because the odor of marijuana provided the
officers with reasonable suspicion to extend the traffic stop
and search the vehicle. However, the testimony regarding the
smell of marijuana is troubling. Although Detectives Myers and
Smith both testified that they smelled an odor of marijuana
emanating from Monroe's vehicle as they approached, they did not
state in either the Affidavit of Complaint or the Incident
Report that they detected the odor of marijuana, nor was there
any testimony they communicated their observation to each other
or to Monroe. Before the response to the motion to suppress was
filed, there was no indication that the officers searched
Monroe's vehicle because they detected the smell of marijuana.
*See United States v. Martinez*, 356 F. Supp. 2d 856, 870 (M.D.
Tenn. 2005)(stating that the agent's credibility was undermined
because he initially asserted a different reason for stopping
the vehicle than that asserted at the suppression hearing). The
Affidavit of Complaint and the Incident Report justify the
search as an inventory search conducted by Detective Smith and

20

do not mention a search by Detective Myers based on the smell of marijuana. (*See* Aff. Compl., Ex. 3; Incident Report, Ex. 15.)

Detective Myers's and Detective Smith's testimony is further undermined by other evidence. First, the Affidavit of Complaint and the Incident report undermine both Detective Myers's and Detective Smith's testimony. Detective Myers initially testified that he never reviewed the Affidavit of Complaint or the Incident Report, but later admitted that he had reviewed the Affidavit of Complaint, as he had sworn to its truthfulness in front of a judicial officer. The Affidavit of Complaint and Incident Report indicate that Detective Myers and Detective Smith pulled Monroe over, at which time he immediately jumped out and ran away. (*See* Aff. Compl., Ex. 3; Incident Report, Ex. 15.) However, both detectives testified that they spoke with Monroe, asked him out of the vehicle, and that Detective Myers began to search the vehicle based on the smell of marijuana before Monroe fled — none of which are included in the Affidavit of Complaint or the Incident Report. Furthermore, Detective Myers testified that he never popped open the trunk and that the latch through which he reached into the trunk was unlocked. However, Monroe presented evidence, through Cook's testimony, which contradicts Detective Myers's testimony that the latch to the trunk was unlocked. Monroe also testified that Detective Myers popped the trunk before getting in the back seat

21

to search, which is why he fled, and Detective Smith was unable
to testify as to precisely when the trunk was popped open.   It
is   questionable   whether   Detective   Myers   could   have   seen
marijuana in the shoebox through the rear seat compartment latch
if the trunk had not been opened to allow in light.   In addition
and   most   importantly,   as   discussed   later,   the   officers'
testimony regarding consent is also inconsistent.

The   contradictory   versions   of   the   incident   are   troubling
and   make   Detective   Myers's   and   Detective   Smith's   testimonies
regarding   the   circumstances   of   the   search   of   Monroe's   vehicle
unreliable,   including   the   testimony   that   they   smelled   marijuana.
Because   the   court   discredits   Detective   Myers's   and   Detective
Smith's   testimony   about   the   smell   of   marijuana,   there   was   no
reasonable   suspicion   to   extend   the   scope   of   the   traffic   stop.
This   court   finds   that   the   government   did   not   prove   by   a
preponderance   of   evidence   that   the   circumstances   surrounding
Monroe's traffic stop justified a warrantless search.

Lastly,   the   Affidavit   of   Complaint   and   the   Incident   Report
classify the search as an inventory search.   (Exs. 3, 15.)   The
government   does   not   argue   that   the   search   was   an   inventory
search,   but   Detective   Smith   testified   that   he   conducted   an
inventory   of   Monroe's   vehicle.   However,   because   Detective   Myers
searched   Monroe's   vehicle   before   Monroe   fled   and   before   the
decision   to   tow   was   made,   the   search   cannot   be   justified   as   an

22

inventory search.  *See, e.g., United States v. Smith*, 510 F.3d 641, 651 (6th Cir. 2007)(citing *United States v. Lumpkin*, 159 F.3d 983, 987 (6th Cir. 1998))("A warrantless inventory search may only be conducted if police have 'lawfully tak[en] custody of a vehicle.'").

C.   <u>Validity of Consent to Search</u>

Regardless of reasonable suspicion, government officials may conduct a search without a warrant based upon an individual's consent, so long as that consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  "Because the government often asserts that a defendant consented in cases 'where the police have some evidence of illicit activity, but lack probable cause to arrest or search,' [the courts] carefully examine the government's claim that a defendant consented." *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999)(citing *Schneckloth*, 412 U.S. at 227).  If relying on consent to perform a warrantless search, the government has the burden of proving that consent was freely and voluntarily given by a preponderance of the evidence, through "clear and positive testimony." *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011); *see also Florida v. Royer*, 460 U.S. 491, 497 (1983)(stating that "the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given"); *United States v. Canipe*, 569 F.3d 597, 602

(6th Cir. 2009)(quoting *Worley*, 193 F.3d at 385)("The government bears the burden of demonstrating by a preponderance of the evidence, through 'clear and positive testimony' that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.").

Here, Detective Myers and Detective Smith testified to different versions of events in several instances, particularly regarding consent. Detective Myers testified that he obtained consent to search the vehicle from Monroe. Detective Smith stated on direct examination that Detective Myers obtained consent from Monroe but then conceded on cross examination that he was unable to hear the conversation between Monroe and Detective Myers and, therefore, did not actually hear Monroe give consent to the search. The government did not mention consent in its response to the motion to suppress or otherwise provide any information regarding consent until Detective Myers's testimony during the evidentiary hearing. Moreover, the government did not address consent in its Response to Defendant's Supplemental Memorandum. (ECF No. 55.) Monroe testified that he did not consent to the search. No other witnesses were able to testify to the fact of Monroe's consent to the search. Neither the Affidavit of Complaint nor the Incident Report indicates that Monroe consented to a search of

the vehicle.[8] Given the inconsistencies between the officers' testimonies, the discrepancy between Detective Smith's testimony on direct examination and cross examination, Monroe's testimony that he did not consent, and the fact that consent was not raised until the evidentiary hearing, the court finds that the government has failed to carry its burden in proving that Monroe consented to a search.

### III. RECOMMENDATION

For the reasons expressed above, it is recommended that Monroe's motion to suppress be granted and that all evidence obtained from Monroe's vehicle as a result of the unconstitutional search be suppressed.

Respectfully submitted this 30th day of November, 2017.

s/Diane K. Vescovo
DIANE K. VESCOVO
CHIEF UNITED STATES MAGISTRATE JUDGE

NOTICE

Within fourteen (14) days after being served with a copy of this report and recommended disposition, a party may serve and file written objections to the proposed findings and recommendations. A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Failure to file objections within fourteen (14) days may constitute a waiver of objections, exceptions, and further appeal.

---

[8]Detective Myers testified that consent is an important fact which is typically included in an Incident Report and Affidavit of Complaint.